# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, and WISCONSIN, THE DISTRICT OF COLUMBIA and the CITIES of CHICAGO and NEW YORK, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. _____ |
| Plaintiffs, | ) ) | **COMPLAINT AND JURY DEMAND** |
| *ex rel.* GREGORY ARDOIN, | ) ) | |
| Plaintiff-Relator, | ) ) | Filed Under Seal pursuant to 31 U.S.C. § 3730 (b)(2) |
| v. | ) ) | JURY TRIAL DEMANDED |
| UCB, INC. and ALAN MARSHALL, | ) ) | |
| Defendants. | ) | |

Mark Hanna (DC Bar 471960)
Lorrie E. Bradley (DC Bar 996379)
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Ann Lugbill (DC Bar 462850)
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1449
*alugbill@murphypllc.com*

P. Jody Lavergne
Russell J. Stutes, Jr.
Rob McCorquodale
Stutes & Lavergne
600 Broad Street
Lake Charles, LA 70601
Phone: (337) 377-0629
Fax: (337) 433-0601
*jody@stuteslaw.com*
*rusty@stuteslaw.com*
*rob@stuteslaw.com*

# TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.   REGULATORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.    Federal and State Government Health Programs. . . . . . . . . . . . . . . . . . . . . . 7

       B.    The False Claims Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       C.    FDA Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       D.    The Medicare Fraud & Abuse/Anti-Kickback Statute. . . . . . . . . . . . . . . . . 11

       E.    Stark Law - The Medicare/Medicaid Self-Referral Statute. . . . . . . . . . . . . . 12

       F.    The Medicaid Rebate Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       G.    State False Claims Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.    SPECIFIC ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF LAW. . . . . . . . 15

       A.    Illegal and False Marketing of Vimpat as Monotherapy for Epilepsy and Use
            During Seizures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       B.    Illegal and False Marketing of Vimpat for "Seizures". . . . . . . . . . . . . . . . . 21

       C.    Illegal and False Marketing of Vimpat in Hospital Emergency Rooms for
            "Seizures". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

       D.    Illegal and False Marketing of Off-Label Dosing for Vimpat. . . . . . . . . . . . . 29

       E.    Illegal Marketing in Violation of Medicare Fraud & Abuse/Anti-Kickback/
            Stark Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       F.    False Claims Act Medicaid Rebate Violations . . . . . . . . . . . . . . . . . . . . . 31

VI.   CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

COUNT I
False Claims Act - Presentation of False Claims
31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009. . . . . . . . . . . . . . . . . . 32

COUNT II
False Claims Act - Making or Using False Record or Statement to Cause Claim to be Paid
31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009. . . . . . . . . . . . . . . . . . 33

COUNT III
False Claims Act - Making or Using False Record or Statement to Conceal, Avoid and/or
Decrease Obligation to Repay Money
31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009. . . . . . . . . . . . . . . . . . 33

COUNT IV
California False Claims Act
Cal. Gov't Code § 12651 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

COUNT V
Colorado Medicaid False Claims Act
Colo. Rev. Stat. § 25.5-4-303.5 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

COUNT VI
Connecticut False Claims Act
Conn. Gen. Stat. § 17b-301a *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

COUNT VII
Delaware False Claims Act
Del. Code Ann. tit. 6, § 1201 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

COUNT VIII
Florida False Claims Act
Fla. Stat. Ann. § 68.081 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

COUNT IX
Georgia False Medicaid Claims Act
Ga. Code Ann. § 49-4-168 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

COUNT X
Hawaii False Claims Act
Haw. Rev. Stat. § 661-22 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

COUNT XI
Illinois Whistleblower Reward and Protection Act
740 Ill. Comp. Stat. 175/1 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

COUNT XII
Indiana False Claims and Whistleblower Protection Act
Burns Ind. Code Ann. § 5-11-5.5-1 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

COUNT XIII
Iowa False Claims Act
Iowa Code § 685.1 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

COUNT XIV
Louisiana Medical Assistance Programs Integrity Law
La. Rev. Stat. Ann. § 46:439.1 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

COUNT XV
Maryland False Claims Act
Md. Code Ann., Health-Gen. § 2-601 *et seq.*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

COUNT XVI
Massachusetts False Claims Act
Mass. Ann. Laws ch. 12, § 5(A) *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

COUNT XVII
Michigan Medicaid False Claim Act
Michigan Compiled Law § 400.601 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

COUNT XVIII
Minnesota False Claims Act
Minn. Stat. §15C.01 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

COUNT XIX
Montana False Claims Act
Mont. Code Ann. § 17-8-401 *et seq.*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

COUNT XX
Nevada False Claims Act
Nev. Rev. Stat. § 357.010 *et seq.*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

COUNT XXI
New Jersey False Claims Act
N.J. Stat. § 2A:32C-1 *et seq.*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

COUNT XXII
New Mexico Medicaid False Claims Act
N.M. Stat. Ann. § 27-14-1 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

COUNT XXIII
New York False Claims Act
N.Y. State Fin. Law § 187 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

COUNT XXIV
North Carolina False Claims Act
N.C. Gen. Stat. § 1-607 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

COUNT XXV
Oklahoma Medicaid False Claims Act
Okla. Stat. tit. 63 § 5053 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

COUNT XXVI
Rhode Island False Claims Act
R.I. Gen. Laws § 9-1.1-1 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

COUNT XXVII
Tennessee Medicaid False Claims Act and Tennessee False Claims Act
Tenn. Code Ann. § 71-5-181 *et seq.* and Tenn. Code Ann. § 4-18-101 *et seq.* . . . . . . . . . . . . . . 51

COUNT XXVIII
Texas Medicaid Fraud Prevention Act
Tex. Hum. Res. Code Ann. § 36.001 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

COUNT XXIX
Virginia Fraud Against Taxpayers Act
Va. Code Ann. § 8.01-216 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

COUNT XXX
Washington Medicaid Fraud False Claims Act
Wash. Rev. Code § 74.66.005 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

COUNT XXXI
Wisconsin False Claims Act
Wis. Stat. § 20.931 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

COUNT XXXII
District of Columbia False Claims Act
D.C. Code § 2-308.13 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

COUNT XXXIII
The City of Chicago False Claims Act
Chicago Municipal Code, § 1-22-010 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

COUNT XXXIV
New York City False Claims Act
New York Municipal Code, § 7-801 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

EXHIBITS

Exhibit A
RGA00120-RGA00121
UCB POA3 National Meeting Agenda. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Exhibit B
RGA00005-RGA00007
October 24, 2012 Email from Alan Marshall. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Exhibit C
RGA00002-RGA00004
Al's Hospital Keys Slides. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## I.  INTRODUCTION

1.      *Qui Tam* Relator Gregory Ardoin brings this action in the name of the United States Government, the State Governments of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, and the District of Columbia, and the Cities of Chicago and New York ("States"), for false claims that were submitted or caused to be submitted to the United States Government and the Individual States by Defendant UCB, Inc. (hereinafter, UCB) and by UCB Director of Customer Alliances Defendant Alan Marshall for UCB's anti-epileptic drug, Vimpat.

2.      Defendants' False Claims Act violations and its various marketing schemes corrupted the independent medical judgment of physicians, unlawfully increased costs to the United States for prescription drugs, and risked patients' health by improperly influencing physicians' decisions about whether to prescribe drugs and include the items listed below.

3.      UCB's off-label and other illegal marketing activities for Vimpat violated the False Claims Act and United States Food and Drug Administration (FDA) laws by illegally:

   a.      Marketing Vimpat "off-label" as monotherapy for epilepsy and for use during status epilepticus (during a long-lasting seizure), despite its FDA approval and labeling restricted to adjunctive therapy for partial-onset epileptic seizures;

   b.      Marketing Vimpat "off-label" for treatment of "seizures" for non-epileptic patients;

   c.      Marketing Vimpat at dosages higher than the FDA-approved label; and

   d.      Marketing Vimpat "off-label" for seizures by targeting emergency room physicians whose emergency room services do not include diagnosis of epilepsy.

4.      This case is brought pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and pursuant to analogous provisions of state and local law, to recover treble damages and civil penalties on behalf of the United States of America and the Individual States, arising from false or fraudulent claims for reimbursements for prescription drugs that were submitted or caused to be submitted by UCB to federal government-funded programs including, without limitation, Medicaid, Medicare, the Federal Employees Health Benefits Program, and TRICARE/CHAMPUS, in violation of the False Claims Act. The False Claims Act specifically proscribes UCB's conduct involving unlawful marketing of prescription drugs and thus the submission of false or non-reimbursable claims to Medicare, Medicaid, and other government-funded health programs.

5.      Defendants knew or should have known that their unlawful activities would cause physicians and other healthcare professionals to routinely file false claims for reimbursement from the Federal and state governments in violation of the False Claims Act, and involved violations of the Food, Drug and Cosmetics Act, 21 U.S.C. § 301 *et seq.*, the Food and Drug Administration and Modernization Act of 1997, 21 U.S.C. § 351 *et seq.*, and similar State laws.

6.      Because of Defendants' unlawful promotion scheme, patients receiving Vimpat for unapproved and unproven uses received no assurance that their doctors were exercising their independent and fully-informed medical judgment.

7.      Defendants' scheme illegally increased the market share for its products by inducing physicians to prescribe medications they would not otherwise have prescribed but for UCB's illegal marketing efforts. The Federal and State governments consequently paid enormous sums for reimbursement claims that they would have rejected had each been aware of UCB's

illegal actions. Moreover, as a result of UCB's illegal promotions, the public over-utilized UCB drugs and prescription drug costs to the Federal and State governments increased, while UCB reaped illegal profits.

8.     Defendants intentionally chose to promote off-label uses of Vimpat, despite UCB's awareness of the FDA's prohibition on off-label marketing. UCB is subject to a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services as part of a settlement of a False Claims Act case based on similar illegal and off-label marketing of Keppra, another anti-epileptic drug approved only for adjunctive therapy.

9.     UCB's prior settlement covers "promot[ion of] the sale and use of Keppra for uses that were not approved by the Food and Drug Administration as safe and effective . . . . Certain of these unapproved uses were not medically accepted indications for which the United States and state Medicaid programs provided coverage for Keppra." Settlement Agreement, *United States ex rel. Root v. UCB, Inc.*, No. 1:07-cv-1056 (D. D.C. 2007) and *United States ex rel. Maly v. UCB, Inc.*, No. 1:08-cv-1161 (D. Or. 2008).  The Corporate Integrity agreement obligates UCB to "commit[] to full compliance with all Federal health care program and FDA requirements, including its commitment to market, sell, promote, research, develop, provide information about, and advertise its products in accordance with Federal health program requirements and FDA requirements." UCB, Inc. Corporate Integrity Agreement at 7.  The CIA also requires UCB to design compensation policies for sales representatives "to ensure that financial incentives do not inappropriately motivate such individuals to engage in improper promotion, sales, and marketing of UCB's products" and ensure that paid speakers for UCB "may not directly or indirectly

promote the product for off-label uses." UCB, Inc. Corporate Integrity Agreement at 12, 25.

The Corporate Integrity Agreement is effective from May 24, 2011 to May 24, 2016.

10.     Relator Gregory Ardoin, a UCB sales representative, became aware of UCB's

False Claims Act violations and other illegal practices in the course of promoting Vimpat to

physicians in Louisiana. Relator has direct and independent personal knowledge of the

Defendants' illegal marketing practices as a result of his extensive experience with the company

during his employment and his contacts with physicians, hospitals, and other health care

institutions. Relator brings this action on behalf of themselves, the United States of America,

and the States for violations of the United States and State False Claims Acts.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction to this Court over

actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court also has subject matter

jurisdiction over the counts relating to the State False Claims Acts pursuant to 31 U.S.C.

§ 3732(b), as well as supplemental jurisdiction over the counts relating to the State False Claims

Acts pursuant to 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C.

§ 3732(a) because acts prohibited by 31 U.S.C. § 3729 occurred in this state and this judicial

district. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one act

proscribed by 31 U.S.C. § 3729 occurred in this district.

13.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is filed under seal and

will remain under seal for at least 60 days from its filing date or such other date as is required by

law or the Court so orders, and shall not be served upon the Defendants unless the Court so

orders.

14.     This suit is not based upon prior public disclosure of allegations or transactions in

a criminal, civil, or administrative hearing, lawsuit or investigation, in a Government

Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news

media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730

(e)(4)(A), amended by the Patient Protection and Affordable Care Act, Pub.  L.  No.  111-148, §

1313(j)(2), 124 Stat.  901-902 (2010). Relator has, however, affirmatively disclosed the

allegations herein to the United States Government and the qui tam States, including prior to

filing this Complaint.

15.     To the extent that there has been a public disclosure of the information upon

which the allegations of this Complaint are based that is unknown to Relator, Relator is an

original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B), amended by the

Patient Protection and Affordable Care Act, Pub.  L.  No.  111-148, § 1313(j)(2), 124 Stat.

901-902 (2010) and similar state law provisions. Relator possesses direct and independent

knowledge of the information as a result of an extensive independent investigation he personally

conducted into Defendants' wrongdoing, which he acquired in the course of his employment with

Defendant UCB as a result of his investigation.  Relator voluntarily provided the government

with this information prior to filing this action.  See 31 U.S.C. § 3730(e)(4).

III.    PARTIES

16.     Relator Gregory Ardoin has worked as a Sales Representative for UCB for approximately 9 years.  Relator Ardoin began working in sales for UCB in 1997.  He left the company in 2004 to work for another pharmaceutical company and returned  to UCB in 2011.

17.     Relator Ardoin is currently a UCB Central Nervous System Senior Sales Specialist assigned to a sales territory in Louisiana.  He specializes in promoting sales of Vimpat and another UCB drug indicated for treating Parkinson's disease.

18.     Defendant UCB is a Delaware corporation with its principal place of business in Smyrna, Georgia.  UCB's primary U.S. manufacturing facility is located in Rochester, New York.  UCB is a subsidiary of UCB S.A., a Belgian corporation.

19.     UCB is engaged in the business of manufacturing, marketing, and selling prescription drugs and other products for the prevention, diagnosis, and treatment of diseases throughout the United States of America and around the world.  UCB manufactures and markets the prescription drug Vimpat.

20.     UCB generated net sales of approximately one and a half billion dollars within North America for the fiscal year 2012.  UCB employs over 1,900 people in the United States.

21.     Defendant Alan Marshall is UCB's Director of Customer Alliances and resides in Arizona.  Defendant Marshall was formerly UCB's National Sales Manager.  He has a principal role in directing  UCB's marketing of Vimpat and performs many duties normally associated with the National Sales Manager position.  Defendant Marshall directs the off-label marketing strategies and sales messages for Vimpat and directed the UCB sales staff to refer to "seizures"

and omit references to "epilepsy" in marketing Vimpat, a drug approved only for treating

epilepsy, to emergency room physicians, even though they do not diagnose epilepsy.

## IV.   REGULATORY FRAMEWORK

### A.   Federal and State Government Health Programs

22.   The Federal and State governments, through their Medicare, Medicaid, and other

health programs, are among the principal purchasers of UCB products.

23.   Medicare is a Federal government program primarily benefitting the elderly that

was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act.

Medicare is administered by the Center for Medicare and Medicaid Services.  Medicare pays for

most self-administered prescription medications under the Medicare Prescription Drug

Improvement and Modernization Act of 2003's Medicare Part D prescription coverage program.

24.   Congress created Medicaid at the same time it created Medicare in 1965 by

adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that

provides payment of medical expenses to low-income patients.  Funding for Medicaid is shared

between the Federal government and the State governments participating in the program.  The

Federal government separately matches certain state expenses incurred in administering the

Medicaid program.  While specific Medicaid coverage guidelines vary from state to state,

Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid often

provides more expansive coverage than does Medicare.

25.   Medicaid coverage for prescription drugs is broad.  Nearly every state has opted to

include basic prescription drug coverage in its Medicaid plan.

26.     TRICARE is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents.  The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.  TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits. Managed care support contractors create networks of civilian health care providers.  Military prescription drug benefits are provided through these programs: military treatment facility outpatient pharmacies, TRICARE contractor retail pharmacies, and a national contractor's mail-order service.

27.     The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for over  8 million federal employees, retirees, and their dependents.  FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.  The federal government also provides health benefits through other programs, including, but not limited to, those administered by the Department of Labor.

28.     The States, the District of Columbia, and the Cities of New York and Chicago provide health insurance coverage to their employees, either by purchasing insurance through a commercial preferred provider organization or health maintenance organization, or by self-insuring.

**B.    The False Claims Act**

29.    Originally enacted in 1863, the False Claims Act was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 Amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States.  The Act was again amended in 2009 and 2010, further strengthening the law.

30.    The False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government.  31 U.S.C. § 3729(a)(1), (2).  The False Claims Act empowers private persons who have information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.  The complaint must be filed under seal without service on any defendant.  The complaint remains under seal while the government conducts an investigation of the allegations in the complaint and determines whether to join the action.

31.    Knowingly paying kickbacks or undisclosed price discounts to physicians to induce them to prescribe a reimbursable drug, and promoting off-label uses of such drugs by a person who seeks reimbursement from a federal government health program for the drug, or who causes another to do so, while certifying compliance with the Medicare Fraud & Abuse/Anti-Kickback Statute, the Medicaid Rebate Statute, and the Food, Drug and Cosmetics Act (or while causing another to so certify), or billing the government as if in compliance with these laws, violates the False Claims Act.

### C.      FDA Regulations

32.      Pursuant to the Food, Drug and Cosmetics Act (FDCA), 21 U.S.C. §§ 301 et seq., the FDA strictly regulates, among other things, the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies in promoting and selling FDA-approved prescription drugs.

33.      The FDA regulates drugs based on the "intended uses" for such products.  A manufacturer that wishes to market any new drug must demonstrate to the FDA that the product is safe and effective for each intended use.  21 U.S.C. §§ 331(d), 355(a), 360b(a).

34.      The FDA reviews a pharmaceutical manufacturer's application for approval of a new drug to determine whether the drug is safe and effective for its intended use.  21 U.S.C. § 355.  "Off-label marketing" refers to the marketing of an FDA-approved drug for uses that have not undergone FDA scrutiny and approval, i.e. for purposes not approved by the FDA.

35.      Once a drug is approved for a particular use, the FDA allows doctors to prescribe the drug for medical uses that are different from those approved by the FDA.  The FDA also allows doctors to request and receive information from drug manufacturers about off-label uses of FDA-approved drugs.  However, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not yet approved. Sales representatives like Relator are specifically prohibited by FDA law from marketing or promotion of pharmaceuticals for purposes that do not fall within the FDA-approved labels.

36.      Any failure to fairly and accurately represent the approved uses, safety, and other required information about a prescription drug is considered misbranding, and is, as a matter of law, a false and fraudulent statement.  21 U.S.C. §§ 331(a)-(b), 352(a), (f), (n).

37.     Any presentations, promotions, or marketing to physicians of products for use in a manner other than that approved for labeling purposes by the FDA is considered off-label marketing and is proscribed by the FDA.  21 U.S.C. §§ 331(a)-(b), 352(a), (f).

38.     The Food and Drug Act requires that all "new drugs," as defined in 21 U.S.C. § 321(p), be approved by the FDA as safe and effective prior to marketing.  The marketing of a new drug without pre-approval by the FDA violates the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 355 and 331(d).

**D.     The Medicare Fraud & Abuse/Anti-Kickback Statute**

39.     The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a –7b(b), which also covers Medicaid, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit, or receive remuneration to induce the referral of business reimbursable under a federal health benefits program.  The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

40.     In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit any provider from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals, or from receiving remuneration that takes into account the volume or value of any referrals or business generated.  42 C.F.R. § 1001.952(f).  Remuneration paid to providers is an illegal kickback when it is paid to induce or reward the number of drug prescriptions written. Kickbacks are harmful to public policy because they increase the expenditures paid by government-funded health benefit programs by inducing medically unnecessary use of prescription drugs and excessive reimbursements.  Such kickbacks also reduce a patient's health care choices because they can cause physicians to advocate

off-label uses of a drug or prescribe drugs for off-label uses regardless of whether such uses are in the best interests of the patient.

41.     The Medicare Anti-Kickback Statute provides eight statutory exceptions from its statutory prohibitions, and certain regulatory "safe harbors" have been promulgated to exclude certain types of conduct from the reach of the statute.  42 U.S.C. § 1320a-7(b)(3).  No statutory exceptions or regulatory safe harbors protect Defendants' conduct in this case.

42.     The Medicare and Medicaid Patient and Program Protection Act of 1987 authorizes the exclusion of any individual or entity from participation in the Medicare and Medicaid programs if it is determined that the party violated the Medicare Anti-Kickback Statute.  In addition, the Balanced Budget Act of 1997 amended the Act to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration, offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, solicited, or received for a lawful purpose.  42 § U.S.C. 1320a-7a(a)(7).

### E.     Stark Law - The Medicare/Medicaid Self-Referral Statute

43.     The Medicare-Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn *et seq.*, known as the "Stark Law," prohibits a pharmaceutical manufacturer from paying remuneration to physicians for referring Medicaid patients to the manufacturer for certain "designated health services," including drug prescriptions, where the referring physician has a nonexempt "financial relationship" with that manufacturer.  42 U.S.C. § 1395nn(a)(1), (h)(6).  The Stark Law provides that the manufacturer shall not cause to be presented a Medicaid claim for such prescriptions.

The Stark Law also prohibits payment of Medicaid claims for prescriptions rendered in violation of its provisions.  42 U.S.C. § 1395nn(a)(1), (g)(1).

F.     **The Medicaid Rebate Statute**

44.     The Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, is designed to return money to the Medicaid program in the form of rebates from drug manufacturers.  Federal law provides that drug manufacturers must pay rebates to the states to ensure that the Medicaid program is paying the lowest price at which the manufacturer sells a covered outpatient drug to any purchaser in the United States, inclusive of cash discounts, free goods, kickbacks, volume discounts, and rebates. The "best price" provision is intended to ensure that the government is being provided the lowest price on drugs.

45.     To have their drugs eligible for Medicaid payment, all drug manufacturers must provide "best price" information to the Centers for Medicare and Medicaid Services ("CMS"). CMS uses this "best price" information to calculate the rebates payable to the Medicaid program.

46.     Drug manufacturers provide both "best price" information and Average Manufacturer Price information to CMS.  CMS then calculates a unit rebate amount, and provides that information to state Medicaid agencies.  The states then consider utilization data provided by pharmacies, and the unit rebate amount, to calculate the rebate owed to them by the manufacturer.  The entire system, however, relies upon manufacturers honestly conveying to CMS correct "best price" information and Average Manufacturer Price information.  Any overstatement of the best price, whether intentional or unintentional, will cause an underpayment in rebate amounts.

47.    The Medicaid Rebate Statute states, in part, that the term "best price" shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section).  42 U.S.C. § 1396r-8(c)(1)(C)(ii).

48.    The Federal government has great financial interest in the program.  The Medicaid Rebate Statute provides that amounts received by the States under the "best prices program" shall be considered to be a reduction in the amount expended under the State Medicaid Plan for purposes of calculating the federal contributions to State Medicaid programs.  42 U.S.C. § 1369r-8(b)(1)(B).

49.    As a result of pervasive "best price" fraud, the Office of the Inspector General of the United States Department of Health and Human Services promulgated compliance materials on May 5, 2003, which observed that manufacturers have "a strong financial incentive to hide de facto pricing concessions" (in particular, kickbacks and price discounts) that could affect "best price" calculations and trigger increased Medicaid rebates.  OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23735 (May 5, 2003).  The Office of the Inspector General instructed manufacturers to report "best prices" which "accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to all purchasers."  *Id.* at 23733-23734.  According to the Office of the Inspector General, "pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes."  *Id.*

50.    The Medicaid program reimburses doctors only for "covered outpatient drugs" for which a rebate is paid by the drug's manufacturer.  42 U.S.C. § 1396b(i)(10).  Each state

Medicaid program has the power to exclude any drug from coverage if the prescription is not

issued for a "medically accepted indication."  42 U.S.C. § 1396r-8(d)(1)(B).  A "medically

accepted indication" includes only those indications approved by the FDA, and those off-label

uses that are "supported by one or more citations included, or approved for inclusion, in any of

the compendia" listed in the statute.  42 U.S.C. § 1396r-8(k)(6).

>    **G.    State False Claims Acts**

51.    Twenty-eightstates, the District of Columbia, and the Cities of Chicago and New

York ("the States") have passed False Claims Acts that mirror the language of the Federal False

Claims Act.  Some states' false claims acts relate only to the states' Medicaid program, while

other states' statutes cover the presentation of false claims for payment in any context.

## V.    SPECIFIC ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF LAW

52.    Vimpat, also known by the generic name, lacosamide, comes in both pill and

liquid form.  Vimpat was approved by the FDA in 2008 for the following uses:

>    Vimpat (lacosamide) Tablets as adjunctive therapy in the treatment
>    of partial-onset seizures in patients with epilepsy aged 17 years and
>    older.
>
>    Vimpat (lacosamide) Injection as adjunctive therapy in the
>    treatment of partial-onset seizures in patients with epilepsy aged 17
>    years and older when oral administration is temporarily not
>    feasible.

53.    UCB's 2012 Vimpat revenues were approximately $430 million.

54.    Epilepsy is not a single disease, but a group of brain disorders that cause seizures.

Seizures occur when the normal electrical activity in the brain becomes rhythmic or repetitive.

Seizures can appear outwardly as convulsions or shaking, or as a "slump" in the body's posture or a brief loss of awareness.

55.     Many anti-epilepsy medications prevent and treat epilepsy by decreasing the abnormal excitement of neurons in a patient's brain.

56.     Partial-onset seizures are epileptic seizures that begin in a focal point, one specific area of the brain.  They are distinguished from generalized seizures, sometimes known as "grand mal" seizures, which begin over the entire brain at the same time.

57.     The symptoms of partial-onset seizures include sudden, jerky movements on one part of the body, distorted senses of hearing, smell, vision, or touch, and numbness.

58.     Approximately one percent of the United States population is estimated to have epilepsy, with about 200,000 new cases diagnosed annually, many of them children under the age of 17.  In patients over 10 years of age, over half of all new epilepsy diagnoses are for partial-onset seizures. As many as 75% of epilepsy patients can be successfully weaned off epilepsy medications. As a result, Vimpat's market should be quite limited to those adult patients experiencing partial onset epileptic seizures and whose seizures are not already adequately controlled by a prescription drug approved by the FDA for first-line treatment of partial onset seizures in patients diagnosed with epilepsy.

59.     Most patients experiencing a seizure do not have and are not diagnosed with epilepsy. Common causes of seizures include medicines, fevers, head injuries, and other diseases. Some seizures may be caused by a new or relatively temporary physical condition that disrupts brain function, such as an injury, tumor, or infection.  Seizures may be triggered by other medical conditions that are relatively common, such as high blood pressure, imbalances in blood sugar,

imbalances in blood sodium, high fever, liver or kidney disease, eclampsia of pregnancy, or the use or abuse of certain prescription and illicit drugs. Having a seizure does not mean that a patient has epilepsy. Most persons experiencing their first seizure do not have epilepsy. Additionally, while some patients may self-report to an emergency room or physician that they had a seizure, the much more serious conditions, strokes and transient ischemic attacks or TIAs (sometimes called warning strokes), can be mistaken for seizures because the symptoms are similar.

A.    **Illegal and False Marketing of Vimpat as Monotherapy for Epilepsy and for Use During Seizures**

60.    The FDA approved Vimpat as adjunctive therapy for the treatment of partial-onset seizures in patients with epilepsy. Adjunctive treatments are treatments that are added to and used in combination with an existing treatment regime. Adjunctive treatment differs from monotherapy, in which a drug is used on its own, and first-line therapy, in which a drug is given on its own as the first course of treatment.

61.    Common first-line treatments for epilepsy include dilantin, tegretol, and lamictal, all of which are available in generic form at modest cost. In contrast, Vimpat costs about $300 monthly at a modest dosage of 200 mg daily.

62.    The FDA approved Vimpat as a treatment for partial-onset epileptic seizures. Vimpat is not approved for all types of epilepsy. Vimpat is not approved for all types of epileptic seizures, nor is it approved for treatment of seizure disorders or seizures of unknown causation.

63.    Vimpat is not approved for treatment in status epilepticus, a continuous, unremitting seizure that lasts longer than five minutes. Status epilepticus is an emergency condition that requires prompt hospital treatment.

17

64.     UCB intentionally and knowingly engaged in a marketing campaign designed to convince physicians that Vimpat is indicated for monotherapy and not just adjunctive therapy. This marketing strategy is similar to that used by UCB to market an earlier anti-epilepsy drug, Keppra, which is now available in generic form.   Through an aggressive marketing campaign, UCB convinced many physicians that Keppra was indicated for monotherapy treatment of certain types of epileptic seizures, when it was only approved for adjunctive therapy.

65.     UCB's management employee responsible for directing and encouraging UCB's current Vimpat off-label campaign, Defendant Alan Marshall, is the same person who directed UCB's off-label marketing program for Keppra. Defendant Alan Marshall, UCB former National Sales Manager and now Director of Customer Alliances, is now intentionally and knowingly directing UCB's Vimpat off-label marketing program, particularly its program aimed at hospital emergency room physicians.   Mr. Marshall was responsible for "hospital relationships" for UCB's Keppra marketing program and was responsible for building the hospital sales force for Keppra, now used for off-label promotion of Vimpat.

66.     UCB sets monthly quotas for its sales representatives for sales of Vimpat to hospitals.   Bonus compensation is awarded to UCB sales representatives who meet their quotas. Sales quotas compare hospital sales of Vimpat to hospital sales for nine other anti-epilepsy drugs: Dilantin, Tegretol, Lamictil, Depakote, Lyrica, Keppra, Topamax, Zonegran, and Trileptal.   Notably, six of these drugs have at least one indication for monotherapy treatment of certain types of epileptic seizures.   By comparing Vimpat sales to the sales of monotherapy anti-epileptic drugs, UCB encourages and supports its marketing sales force in encouraging use of Vimpat as monotherapy.   If sales representatives wish to receive bonuses or keep their jobs,

they must market Vimpat against the monotherapy competitor drugs used as comparators by UCB management.

67.     UCB's speaker program unlawfully promotes the use of Vimpat as monotherapy. UCB encourages physicians in its speakers bureau to promote the off-label use of Vimpat as monotherapy.  Sales representatives learn which speakers are willing to promote Vimpat as monotherapy by accessing survey forms available on a UCB internal website that rates the speaker's performance.  Speakers who are rated four stars for "answers questions" are speakers who are willing to speak or answer questions about off-label use of Vimpat.  UCB managers encourage sales representatives to select speakers who are coded this way and will promote Vimpat as monotherapy.  Although the survey form asks sales representatives to identify any "compliance related issues during the program," UCB sales representatives understand that they are expected to answer "no" to this question and, thus, virtually all do so, even though the physician speaker advocated use of Vimpat off-label for unapproved uses at a UCB-sponsored and financially underwritten meeting, luncheon, dinner, or seminar.

68.     During a speaker presentation, when a physician speaker advocates Vimpat as monotherapy, UCB sales representatives usually act as if they have not observed any off-label marketing, including by choosing that time to leave the room to return a phone call or visit the restroom.  By such tactics, sales representatives then fail to answer truthfully as to the computer-based UCB speaker compliance survey question regarding whether there were "compliance issues during the program."  At the end of the event, UCB representatives are instructed to recite the FDA-approved indication for Vimpat and state that Vimpat is approved for adjunct therapy for partial onset epileptic seizures, without referring to the physician speaker's presentation of

19

off-label information earlier in the program.  Defendants and UCB managers instruct the sales

force that this generic, routine restating of the Vimpat approved indication "cures" the off-label

nature of the presentation.

69.     UCB uses physician speakers to promote the use of Vimpat for administration

during status epilepticus, while a prolonged seizure is in progress.  In Relator Ardoin's territory,

UCB managers encouraged the use of a popular speaker, a New Orleans neurologist who is

highly rated by UCB sales representatives.  This neurologist tells program attendees that he

personally uses Vimpat for patients in status epilepticus and believes it is safe.  Because many

other Vimpat speakers do not speak about off-label use in status epilepticus, this neurologist is a

sought-after speaker because he will discuss and advocate the off-label use of Vimpat in status

epilepticus.  Relator Ardoin has been asked by several physicians he has called upon about this

off-label use of Vimpat.

70.     UCB pays physicians significant sums of money to give speaker presentations,

including presentations where off-label uses of Vimpat are discussed.  Physicians can receive up

to $8,000 per day to give two to three presentations.  These presentations are usually made to

small groups of physicians, typically with only three or four doctors present, at most.

71.     Patients are harmed by UCB's off-label marketing of Vimpat as monotherapy

because patients may not receive the most effective drug to treat or prevent epileptic seizures in

the future.  Physicians may be unaware that Vimpat is approved only as adjunctive therapy.  As

has occurred as a result of its off-label marketing campaign for Keppra, UCB's Vimpat marketing

campaign has created a misconception among many physicians that Vimpat is an approved

monotherapy treatment for epilepsy.

72.     UCB's off-label marketing of Vimpat described above violates UCB's Corporate Integrity Agreement.

**B.     Illegal and False Marketing of Vimpat for "Seizures"**

73.     Defendant Alan Marshall and other UCB sales leaders have directed UCB sales representatives not to use the word "epilepsy" in marketing Vimpat, particularly when promoting Vimpat to emergency room, family practice, internists, and general practitioners who may treat, but normally do not diagnose epilepsy.  Instead, Defendant Marshall and other UCB officials direct sales representatives to use the word "seizures."  In this manner, Defendants are marketing Vimpat broadly for the relatively large market of patients reporting a seizure (about 10% of the U.S. population), in contrast to the relatively much smaller universe of adult patients diagnosed definitively as suffering from partial-onset seizures due to epilepsy and whose condition is not controlled by their existing medication, including one indicated for monotherapy (less than one-half of 1% of the U.S. population).

74.     Defendant Marshall sent an email to UCB regional business directors, summarizing a presentation at a national sales meeting held in Dallas, Texas in October 2012. This email listed suggested questions that sales representatives could use to promote Vimpat. Mr. Marshall's questions specifically used the term "seizure," not the more appropriate "epilepsy," "epileptic seizure," or "partial-onset seizure," given Vimpat's FDA-approved indication.  In fact, the term "epilepsy" does not appear once in the long list of suggested sales promotion questions.

75.     Defendant Marshall's  October 2012 email was forwarded to district managers and sales representatives throughout the country.  A UCB Regional Business Director in the

Southeast Region, urged district managers to discuss Alan Marshall's questions with their sales teams.  Relator Ardoin's District Manager agreed that Alan Marshall's questions were useful for increasing Vimpat sales and forwarded them to the sales staff he supervised.

76.     UCB's off-label marketing of Vimpat described above violates UCB's Corporate Integrity Agreement.

### C.     Illegal and False Marketing of Vimpat in Hospital Emergency Rooms

77.     In June 2011, when Relator Ardoin returned to work at UCB, UCB was directing its sales force to market Vimpat directly to emergency room physicians.  Relator Ardoin and other sales representatives were provided with a spreadsheet of hospitals to visit in their territory. By April 2012, UCB began training its sales force on hospital calls and emphasizing the importance of sales calls to hospitals.  Relator Ardoin and other representatives were given a separate hospital sales quota and received bonus compensation based on their hospital sales.

78.     In June or July 2012, UCB sent a Houston-area hospital sales representative to a district meeting in Baton Rouge, Louisiana, to train Relator Ardoin and other sales representatives on hospital sales.  The UCB Houston hospital representative was trained by Defendant Alan Marshall, who developed UCB's hospital sales strategy for Vimpat.  The UCB Houston hospital representative consistently received awards and recognition for high sales during Relator Ardoin's tenure at UCB and was named 2012 Hospital Rep of the Year.  In the training, the UCB Houston hospital representative  instructed sales representatives not to say "epilepsy" when marketing to hospitals and hospital physicians, and to say "seizures" instead. the The UCB Houston hospital representative instructed sales representatives to "hang out" in hospitals and emergency rooms to promote Vimpat to physicians and staff there.  UCB's hospital

marketing strategy differed markedly from UCB's prior hospital marketing activities, which primarily involved meeting with hospital pharmacists.  The UCB Houston hospital representative instructed sales representatives to sponsor in-service trainings for hospital doctors and nurses that featured UCB-paid speakers advocating use of Vimpat.  The benefit to these in-service trainings, as the UCB Houston hospital representative explained, was that the doctors and nurses could ask direct questions to the Vimpat speaker, allowing the speaker to respond to questions regarding off-label usage and dosage.  When discussing this strategy, the UCB Houston hospital representative warned sales representatives to "be careful about who is watching and listening," indicating that she knew that this sales strategy involved unlawful and off-label promotion.

79.     At UCB's national Plan of Action meeting held in Dallas, Texas on October 12, 2012, Defendant Alan Marshall spoke to Relator Ardoin and other sales representatives from the Gulf Coast District about strategies for hospital sales.  In this session, Defendant Marshall repeated the message that in hospital sales, "it's not epilepsy, it's seizures."  Mr. Marshall's presentation was an intentionally scheduled and pre-planned part of the meeting agenda.  *See* Exhibit A.  Upon information and belief, Defendant Marshall made similar presentations to sales representatives from other districts at the Dallas Plan of Action meeting.  Several weeks after the Plan of Action meeting, Defendant Marshall sent an email on October 24, 2012, with the "engaging questions" he had shared at the meeting for use in hospital marketing.  *See* Exhibit B. This email, instructing sales representatives to refer to "seizure patients" and "seizure diagnosis" when marketing to hospitals, was sent to sales staff and managers nationwide, including the Vimpat national sales director, district managers, regional managers, and training and development staff.  None of the email recipients, nor anyone associated with UCB's CIA and

other compliance activities, responded with concerns regarding the off-label nature of this marketing strategy.

80.    At a district meeting in January 2013 in Baton Rouge, Louisiana, Relator Ardoin's district manager focused on hospital sales and referred to the sales strategies in Defendant Marshall's presentation the previous October.  The district manager made slides based on Defendant Marshall's presentation, entitled "Al's Hospital Keys" and distributed the slides to the Gulf Coast District sales force via  an email dated January 13, 2013.  The slides contained the reminder that "In hospital it's not epilepsy, it's seizures."  *See* Exhibit C.

81.    UCB's market research had revealed that approximately one-third of all new patients starting an anti-epileptic drug started with a prescription written in a hospital.  In addition, UCB market research showed that 91% of patients refill a prescription of Vimpat after they receive it.  In order to take full advantage of the market research data showing a high rate of first-time epilepsy prescriptions being written as a result of a hospital visit and continuing use thereafter, UCB first emphasized calling upon all emergency room physicians to promote Vimpat off-label.  Then, UCB hired new, specialized institutional sales representatives to call on specialist physicians, such as neurologists and epileptologists, in large teaching hospitals, to augment the off-label emergency room promotion.

82.    Internal company emails emphasize UCB's continued urgency to expand hospital prescribing of Vimpat.  For example, an email dated February 19, 2013 from Relator Ardoin's direct supervisor noted low hospital sales in the region and emphasized the "importance of selling Vimpat in all channels."  UCB's regional business director for the Southeast Region instructed managers in an email sent February 20, 2013 to "make sure your reps have not lost

focus on the hospital channel." In an email sent on March 5, 2013, Relator Ardoin's district manager reiterated to Relator Ardoin and his fellow sales representatives: "I know hospital sales have been a big focus lately." UCB's focus on hospital physicians who are not experts in treating epilepsy, such as emergency room physicians, was part of UCB's 2013 goal to increase Vimpat sales by "expand[ing] the prescriber base" beyond the physicians who typically prescribe anti-epilepsy drugs like Vimpat.

83. As part of UCB's emphasis on the "hospital channel," sales representatives like Relator Ardoin, who call on physicians in smaller, local hospitals were instructed to focus their efforts on emergency room physicians to obtain new business. With emergency room physicians, UCB sales representatives promote Vimpat as a prescription solution for patients who present at the emergency room reporting that they have experienced a seizure. UCB instructs Vimpat sales representatives to deliberately use the word "seizure" in marketing to emergency room physicians and to avoid the term "epilepsy."

84. UCB instructed its sales staff to carry out both of its false marketing schemes for Vimpat as monotherapy and Vimpat for "seizures" in hospital emergency rooms, because physicans in this setting were more receptive and less skeptical of the Vimpat marketing message than epilepsy and brain-function specialists such as neurologists and epileptologists. Emergency rooms were targeted because many patients receive initial treatment for seizures at the emergency room and UCB's marketing efforts were more likely to yield significant increases in Vimpat sales.

85. Emergency room physicians' practice differs from neurologists or epileptologists. In the emergency room, brief patient encounters, usually post-seizure, are inadequate to make an

epilepsy diagnosis.  Emergency room physicians typically cannot and do not witness the seizures, confirm that seizures occurred, or administer medication to end partial onset seizures while in progress.  Furthermore, the emergency room physician provides no follow-up care or inquiry, critical for an accurate diagnosis of epilepsy.  Emergency room physicians are not equipped in terms of time, training, expertise, and medical function to diagnose epilepsy.  They do not typically make diagnoses of epilepsy when emergency room patients self-report they have recently had a seizure.  Confirmation and diagnosis of epilepsy is usually left up to a specialist, such as a neurologist or an epileptologist, and, even then, only after an in-depth series of medical testing and evaluation and the occurrence of more than one seizure that has not been provoked by a high fever, medication, or other non-epileptic trigger.

86.     Patients with an established epilepsy diagnosis and their families usually understand what is happening when the patient has a seizure, and do not typically seek treatment in the emergency room.  Patients with undiagnosed epilepsy or a seizure of unknown etiology are more likely to be treated in the emergency room.  UCB's promotion of Vimpat to emergency room physicians results in patients receiving the wrong diagnosis and wrong or useless medication that can have serious side effects.

87.     UCB marketing to emergency room physicians differs from traditional marketing by pharmaceutical representatives, frequently done in the privacy of the physician's office and away from office and patient-related distractions, which allows for the physician to better understand the drug being marketed and its potential for treating ongoing patients. Emergency room physicians frequently do not have private office space within the emergency department, nor anywhere else in the hospital.  In order to market to emergency room physicians, Relator

Ardoin and his colleagues were instructed to show up at the emergency room and "hang out" while awaiting a chance to speak to the physicians during a coffee break or other break in patient responsibilities.  Because UCB sales representatives dress professionally and are not experiencing an acute medical emergency, they tend to stand out and are readily noticed by emergency room physicians.

88.     UCB's marketing scheme in emergency rooms results not only in increased Vimpat sales for off-label uses, but increases the risk of patient harm.  Once a patient is prescribed an anti-epilepsy drug in the hospital, even though no diagnosis of epilepsy was made in the emergency room, other physicians, particularly internists, family medicine doctors, and general practitioners, tend to be reluctant to discontinue drugs like Vimpat.  These physicians may believe that Vimpat was appropriately prescribed in conformance with the label and that patients were actually diagnosed with epilepsy.  If the patients had no seizures since the emergency room visits, which may particularly be true as to those not suffering from epilepsy, these patients may think that Vimpat is working to prevent seizures.

89.     UCB's scheme to get physicians to initiate treatment with Vimpat in the emergency room results in patients taking medication for which there is no therapeutic benefit and, instead, could compromise their health.  In addition, the scheme interferes with the accurate and prompt diagnosis of the patients' underlying condition causing seizures, including the possibility that the patient's health condition is causing them to experience one or more strokes.

90.     UCB's scheme to promote Vimpat in emergency rooms exposes patients to serious side effects.  Although the risk of certain side effects may be justified in a patient who is correctly diagnosed with partial-onset epileptic seizures, this risk-benefit balance is not the same

27

for patients whose seizures have other causes, since Vimpat has no proven effect on seizures not caused by epilepsy.

91.     Vimpat has serious side effects, including suicidal ideation, dizziness, ataxia, and cardiac rhythm abnormalities and must be used with caution in patients with kidney and liver impairment, diabetic neuropathy, and cardiac conduction problems.

92.     The prescribing information for Vimpat describes the risk of suicidal ideation and states that the risk of suicidal behavior must be balanced against the risk of untreated illness.  The prescribing information cautions patients and their family members to be alert for symptoms of depression or suicidal ideation and report any changes in mood or behavior to the patient's physician.

93.     The Vimpat prescribing information notes that the risk for dizziness or ataxia increases with dose. Ataxia is the lack of muscle coordination during voluntary movement. Ataxia can affect a patient's most basic movements, such as speech, eye contact, and swallowing.

94.     Possible side effects of Vimpat include syncope or loss of consciousness, cardiac rhythm and conduction disorders, and, in rare cases, multiorgan hypersensitivity.  Caution must be used for dosing in patients with certain common cardiac conditions. Caution is required for patients with renal impairment, hepatic impairment, or geriatric patients, because blood concentrations of Vimpat may be higher in these patients than in others.  Higher blood concentrations of Vimpat can lead to increased risk of side effects.

95.     UCB instructs its sales representatives not to focus on the cautions included in Vimpat's label.  UCB promotes Vimpat as being safer than other anti-epileptic drugs.  In fact, UCB's market research shows that many physicians are comfortable prescribing Vimpat because

they believe it to be "safer" and to have fewer side effects than other anti-epileptic drugs. Popular physician speakers from UCB's speaker program reinforced the perception that Vimpat is safe, especially when compared to other anti-epileptic drugs.

96.     UCB's off-label marketing, use of speakers to deliver off-label marketing messages, and sales representative compensation described above violates UCB's Corporate Integrity Agreement.

**D.     Illegal and False Marketing of Off-Label Dosing for Vimpat**

97.     The FDA-approved Vimpat labels states, "Initially, give 50 mg twice daily (100 mg/day). The dose may be increased, based on clinical response and tolerability, at weekly intervals by 100 mg/day given as two divided doses to a daily dose of 200 to 400 mg/day."

98.     UCB instructs its speakers and sales representatives to promote Vimpat for use at dosages above those on the FDA-approved label.  UCB promotes Vimpat at higher dosages without the use of the titration, or gradual dose adjustment, "based on clinical response and tolerability."  Instead, UCB promotes Vimpat at initial doses of 200 mg.

99.     UCB instructs physician speakers and sales representatives to discuss medical journal articles about the use of 600 mg daily dosages of Vimpat.  The highest dosage on the FDA-approved label is 400 mg per day.

100.     UCB promotes the use of a "loading dose" for intravenous Vimpat, in contradiction to the approved label's instructions to begin with 50 mg twice daily and gradually titrate the patient's dosage upwards.  A "loading dose" is 200 mg of intravenous Vimpat rapidly infused into the patient within 30 minutes.  UCB promotes the use of higher "loading doses" of Vimpat though its speaker programs and in-service training in hospitals.

101.     Because the incidence of side effects increases with the dose, patients taking doses of Vimpat above those in the approved label are at increased risk of serious side effects, such a suicidal ideation, dizziness, ataxia, and cardiac rhythm abnormalities.  Certain groups of patients, such as the elderly and those with diabetic neuropathy, and kidney or liver impairment, may be more vulnerable to side effects at higher doses of Vimpat.

102.     Starting with an initial dose of Vimpat higher than that on the approved-label may lead to a patient receiving a higher dose of Vimpat than is necessary.  The gradual titration of the dose described in the label allows the dose to be adjusted to the point where it controls the patent's symptoms without unnecessarily increasing the risk of side effects.  Higher doses of Vimpat result in increased profit to UCB but may not result in a therapeutic benefit to patients.

103.     UCB's off-label marketing and use of speakers to deliver off-label marketing messages for Vimpat described above violates UCB's Corporate Integrity Agreement.

> **E.     Illegal Marketing in Violation of Medicare Fraud & Abuse/Anti-Kickback/Stark Law**

104.     As detailed above, UCB's Vimpat marketing, as directed by Defendant Marshall, repeatedly violated the Anti-Kickback Statute, Stark Law, and the False Claims Act because UCB's improper kickbacks and incentives induced physicians to promote Vimpat for off-label uses and to, therefore, to cause prescriptions to be written for Vimpat when they otherwise would not have. Many of those prescriptions were paid for by Medicare, Medicaid, and other government funded health insurance programs.

105.     UCB's Vimpat marketing, as directed by Defendant Marshall, violated the Anti-Kickback Statute, Stark Law, and the False Claims Act because UCB made unlawful payments to physicians in exchange for their speeches and presentations in which they promoted

Vimpat off-label for use as monotherapy and in dosages in excess of the FDA-approved safe

dosages. As a result, these physicians in UCB's Speakers' Bureau and those they influenced

prescribe Vimpat when they would otherwise not have and in quantities that they otherwise

would not have and such tainted prescriptions were paid for by Medicare, Medicaid and other

government-funded health programs.

106.    UCB's use of speakers to deliver off-label marketing messages of Vimpat

described above violates UCB's Corporate Integrity Agreement.

### F.    False Claims Act Medicaid Rebate Violations

107.    Defendant UCB promoted Vimpat by providing large quantities of free and/or

reduced price Vimpat by means of coupons. The coupons were provided to physicians and

patients.

108.    Vimpat marketing materials targeted to physicians promoted the Vimpat patient

assistance plan, which offered a free six-month supply of Vimpat to eligible patients with no

prescription drug coverage whose income was 300% of the federal poverty line or less.  Another

sales aid targeted to physicians promoted a plan whereby patients paying for their prescriptions in

cash could receive Vimpat for $10 a month for twelve months.  Vimpat marketed its patient

assistance programs for patients covered by prescription drug insurance as well.  One

physician-targeted sales aid offered to pay up to $45 of a patient's insurance co-payment for

Vimpat if the patient paid the first $10.

109.    UCB aggressively marketed these Vimpat patient assistance programs to

physicians because UCB's market research showed that many physicians were hesitant to

prescribe Vimpat due to cost concerns.  As explained in an internal training document,

"VIMPAT prescriber market research has shown that product cost is an important factor when choosing an appropriate therapy.  Some prescribers have misperceptions about the true cost of VIMPAT for their patients."  UCB's call lists specifically targeted low prescribing physicians, many of whom were reluctant to prescribe Vimpat, in an effort to increase these physicians' prescribing.

110.    UCB's sales aids and promotional materials targeted towards patients emphasized the rebates available through its patient assistance programs.  One such sales aid offered patients the first 14 day supply of Vimpat for free, with the patient only responsible for paying the first $10 of their insurance co-payment following that, and UCB would paying the remaining co-pay amount under the patient's insurance plan, up to $45.

111.    Because of the cost of prescription Vimpat, Defendant UCB's coupons were very valuable and had the effect of lowering the price of Vimpat for those pharmacies and patients who received and used the coupons, thereby adversely affecting the Medicaid rebate amounts.

## VI.    CLAIMS FOR RELIEF

### COUNT I
**(False Claims Act - Presentation of False Claims)**
**[31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009]**

112.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

113.    Through the acts described above, UCB, Inc. and its agents and employees knowingly presented and caused to be presented to an officer or employee of the United States Government a false and/or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and, as amended 31 U.S.C. § 3729(a)(1)(A).

32

## COUNT II
### (False Claims Act - Making or Using False
### Record or Statement to Cause Claim to be Paid)
### [31 U.S.C. § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B) as amended in 2009]

114.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

115.    Through the acts described above and otherwise, UCB, Inc. and its agents and employees knowingly made, used, and/or caused to be made or used false records and statements in violation of 3l U.S.C. §§ 3729(a)(2), and, as amended 31 U.S.C. § 3729(a)(1)(B) in order to get such false and fraudulent claims paid and approved by the United States Government.

## COUNT III
### (False Claims Act - Making or Using False Record or Statement to
### Conceal, Avoid and/or Decrease Obligation to Repay Money)
### [31 U.S.C. § 3729(a)(7), 31 U.S.C. § 3729(a)(1)(G) as amended in 2009]

116.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

117.    Through the acts described above, in violation of 31 U.S.C. § 3729(a)(7) and as amended, 31 U.S.C. § 3729(a)(1)(G), UCB, Inc. and its agents and employees knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease UCB's obligation to repay money to the United States Government that UCB improperly and/or fraudulently received. UCB also failed to disclose material facts that would have resulted in substantial repayments to the United States.

33

## COUNT IV
## California False Claims Act
## Cal. Gov't Code § 12651 *et seq.*

118.    The allegations of the preceding paragraphs are realleged as if fully set forth

below.

119.    This is a claim for treble damages and civil penalties under the California False

Claims Act. Cal. Gov't Code § 12651 *et seq*.

120.    By virtue of the off-label and false marketing and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

California Medicaid Program (i.e., Medi-Cal) and state health plans for public employees false or

fraudulent claims for the improper payment or approval of prescriptions for Vimpat and

knowingly used false or fraudulent records to accomplish this purpose.

121.    The California Medicaid Program and other state health plans, unaware of the

falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise

would not have been allowed.

122.    By reason of these payments, the California Medicaid Program and other state

health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT V
## Colorado Medicaid False Claims Act
## Colo. Rev. Stat. § 25.5-4-303.5 *et seq.*

123.    The allegations of the preceding paragraphs are realleged as if fully set forth

below.

124.    This is a claim for treble damages and civil penalties under the Colorado

Medicaid False Claims Act. Colo. Rev. Stat. § 25.5-4-304 *et seq*.

125.     By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Colorado Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

126.     The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

127.     By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT VI**
**Connecticut False Claims Act**
**Conn. Gen. Stat. § 17b-301a *et seq*.**

128.     The allegations of the preceding paragraphs are realleged as if fully set forth below.

129.     This is a claim for treble damages and civil penalties under the Connecticut False Claims Act.  Conn. Gen. Stat. § 17b-301a *et seq*.

130.     By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to an officer or employee of the State and the Connecticut Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

35

131.     The Connecticut Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

132.     By reason of these payments, the Connecticut Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

**COUNT VII**
**Delaware False Claims Act**
**Del. Code Ann. tit. 6, § 1201 *et seq*.**

133.     The allegations of the preceding paragraphs are realleged as if fully set forth below.

134.     This is a claim for treble damages and civil penalties under the Delaware False Claims Act. Del Code Ann. tit. 6, § 1201 *et seq*.

135.     By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Delaware Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

136.     The Delaware Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

137.     By reason of these payments, the Delaware Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

36

## COUNT VIII
### Florida False Claims Act
### Fla. Stat. Ann. § 68.081 *et seq.*

138.    The allegations of the preceding paragraphs are realleged as if fully set forth

below.

139.     This is a claim for treble damages and civil penalties under the Florida False

Claims Act. Fla. Stat. Ann. § 68.081 *et seq*.

140.    By virtue of the off-label and false marketing and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Florida Medicaid Program and state health plans for public employees false or fraudulent claims

for the improper payment or approval of prescriptions for Vimpat and knowingly used false or

fraudulent records to accomplish this purpose.

141.    The Florida Medicaid Program and other state health plans, unaware of the falsity

or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would

not have been allowed.

142.    By reason of these payments, the Florida Medicaid Program and other state health

plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT IX
### Georgia False Medicaid Claims Act
### Ga. Code Ann. § 49-4-168 *et seq.*

143.    The allegations of the preceding paragraphs are realleged as if fully set forth

below.

144.    This is a claim for treble damages and civil penalties under the False Medicaid

Claims Act.  Ga. Code Ann. § 49-4-168 *et seq*.

145.     By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Georgia Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

146.     The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

147.     By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT X**
**Hawaii False Claims Act**
**Haw. Rev. Stat. § 661-22 *et seq*.**

148.     The allegations of the preceding paragraphs are realleged as if fully set forth below.

149.     This is a claim for treble damages and civil penalties under the Hawaii False Claims Act. Haw. Rev. Stat. § 661-22 *et seq*.

150.     By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Hawaii Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

151.    The Hawaii Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

152.    By reason of these payments, the Hawaii Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

**COUNT XI**
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. 175/1 *et seq.***

153.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

154.    This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act. 740 Ill. Comp. Stat. 175/1 *et seq*.

155.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Illinois Medicaid Program and other state health plans, including plans for public employees, false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

156.    The Illinois Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

157.    By reason of these payments, the Illinois Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XII
### Indiana False Claims and Whistleblower Protection Act
### Burns Ind. Code Ann. § 5-11-5.5-1 *et seq*.

158.     The allegations of the preceding paragraphs are realleged as if fully set forth

below.

159.     This is a claim for treble damages and civil penalties under the Indiana False

Claims and Whistleblower Protection Law. Burns Ind. Code Ann. § 5-11-5.5-1 *et seq*.

160.     By virtue of the off-label and false marketing and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Indiana Medicaid Program and state health plans for public employees false or fraudulent claims

for the improper payment or approval of prescriptions for Vimpat and knowingly used false or

fraudulent records to accomplish this purpose.

161.     The Indiana Medicaid Program and other state health plans, unaware of the falsity

or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would

not have been allowed.  By reason of these payments, the Indiana Medicaid Program and other

state health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XIII
### Iowa False Claims Act
### Iowa Code § 685.1 *et seq*.

162.     The allegations of the preceding paragraphs are realleged as if fully set forth

below.

163.     This is a claim for treble damages and civil penalties under the Iowa False Claims

Act, Iowa Code § 685.1 *et seq*.

164.    By virtue of the off-label and false marketing and submissions of
non-reimbursable claims described above, Defendants knowingly caused to be presented to the
Iowa Medicaid Program and state health plans for public employees false or fraudulent claims for
the improper payment or approval of prescriptions for Vimpat and knowingly used false or
fraudulent records to accomplish this purpose.

165.    The Iowa Medicaid program and other state health plans, unaware of the falsity or
fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would
not have been allowed.

166.    By reason of these payments, the Iowa Medicaid Program and other state health
plans have been damaged, and continue to be damaged in a substantial amount.

**COUNT XIV**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. Ann. § 46:437.1 *et seq.***

167.    The allegations of the preceding paragraphs are realleged as if fully set forth
below.

168.    This is a claim for treble damages and civil penalties under the Louisiana Medical
Assistance Programs Integrity Law. La. Rev. Stat. Ann. § 46:439.1 *et seq*.

169.    By virtue of the off-label and false marketing and submissions of
non-reimbursable claims described above, Defendants knowingly caused to be presented to the
Louisiana Medicaid Program false or fraudulent claims for the improper payment or approval of
prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this
purpose.

41

170.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

171.    By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XV**
**Maryland False Health Claims Act**
**Md. Code Ann., Health-Gen. §2-601 *et seq*.**

172.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

173.    This is a claim for treble damages and civil penalties under the Maryland False Claims Act.  Md. Code Ann., Health-Gen. §2-601 *et seq*.

174.    By virtue of the off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Maryland Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

175.    The Maryland Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

176.    By reason of these payments, the Maryland Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XVI
## Massachusetts False Claims Act
## Mass. Ann. Laws ch. 12, § 5(A) *et seq.*

177.     The allegations of the preceding paragraphs are realleged as if fully set forth

below.

178.     This is a claim for treble damages and civil penalties under the Massachusetts

False Claims Act. Mass. Ann. Laws ch. 12, § 5(A) *et seq*.

179.     By virtue of the off-label and false marketing and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Massachusetts Medicaid Program and state health plans for public employees false or fraudulent

claims for the improper payment or approval of prescriptions for Vimpat and knowingly used

false or fraudulent records to accomplish this purpose.

180.     The Massachusetts Medicaid Program and other state health plans, unaware of the

falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise

would not have been allowed.

181.     By reason of these payments, the Massachusetts Medicaid Program and other state

health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XVII
## Michigan Medicaid False Claim Act
## Mich. Comp. Laws §400.601 *et seq.*

182.     The allegations of the preceding paragraphs are realleged as if fully set forth

below.

183.     This is a claim for treble damages and civil penalties under the Michigan

Medicaid False Claim Act. Mich. Comp. Laws §400.601 *et seq*.

184.     By virtue of the off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Michigan Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

185.     The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

186.     By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XVIII
### Minnesota False Claims Act
### Minn. Stat. § 15C.01 *et seq.*

187.     The allegations of the preceding paragraphs are realleged as if fully set forth below.

188.     This is a claim for treble damages and civil penalties under the Minnesota False Claims Act.  Minn. Stat. § 15C.01 *et seq.*

189.     By virtue of the off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Minnesota Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

44

190.     The Minnesota Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

191.     By reason of these payments, the Minnesota Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

### COUNT XIX
### Montana False Claims Act
### Mont. Code Ann. §17-8-401 *et seq.*

192.     The allegations of the preceding paragraphs are realleged as if fully set forth below.

193.     This is a claim for treble damages and civil penalties under the Montana False Claims Act. Mont. Code Ann. § 17-8-401 *et seq.*

194.     By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Montana Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

195.     The Montana Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

196.     By reason of these payments, the Montana Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

45

## COUNT XX
### Nevada False Claims Act
### Nev. Rev. Stat. § 357.010 *et seq.*

197.    The allegations of the preceding paragraphs are realleged as if fully set forth

below.

198.    This is a claim for treble damages and civil penalties under the Nevada False

Claims Act. Nev. Rev. Stat. § 357.010 *et seq.*

199.    By virtue of the off-label and false marketing and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Nevada Medicaid Program and state health plans for public employees false or fraudulent claims

for the improper payment or approval of prescriptions for Vimpat and knowingly used false or

fraudulent records to accomplish this purpose.

200.    The Nevada Medicaid Program and other state health plans, unaware of the falsity

or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would

not have been allowed.

201.    By reason of these payments, the Nevada Medicaid Program and other state health

plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXI
### New Jersey False Claims Act
### N.J. Stat. § 2A:32C-1 *et seq.*

202.    The allegations of the preceding paragraphs are realleged as if fully set forth

below.

203.    This is a claim for treble damages and civil penalties under the New Jersey False

Claims Act. N.J. Stat. § 2A:32C-1 *et seq.*

204.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New Jersey Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

205.    The New Jersey Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

206.    By reason of these payments, the New Jersey Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXII
### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-1 *et seq.*

207.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

208.    This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act. N.M. Stat. Ann. § 27-14-1 *et seq*.

209.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

210.    The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

211.    By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT XXIII**
**New York False Claims Act**
**N.Y. State Fin. Law § 187 *et seq.***

212.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

213.    This is a claim for treble damages and civil penalties under the New York False Claims Act. N.Y State Fin. Law § 187 *et seq*.

214.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New York Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records material to a false or fraudulent claim to accomplish this purpose.

215.    The New York Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

216.    By reason of these payments, the New York Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

48

**COUNT XXIV**
**North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-605 *et seq.***

217.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

218.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act.  N.C. Gen. Stat. § 1-605 *et seq*.

219.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the North Carolina Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

220.    The North Carolina Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

221.    By reason of these payments, the North Carolina Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

**COUNT XXV**
**Oklahoma Medicaid False Claims Act**
**Okla. Stat. tit. 63 § 5053 *et seq.***

222.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

223.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act.  Okla. Stat. tit. 63 § 5053 *et seq*.

49

224.     By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

225.     The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

226.     By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXVI
## Rhode Island False Claims Act
## R.I. Gen. Laws § 9-1.1-1 *et seq.*

227.     The allegations of the preceding paragraphs are realleged as if fully set forth below.

228.     This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act. R.I. Gen. Laws § 9-1.1-1 *et seq*.

229.     By virtue of the off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Rhode Island Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

230.    The Rhode Island Medicaid Program and other state health plans, unaware of the

falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise

would not have been allowed.

231.    By reason of these payments, the Rhode Island Medicaid Program and other state

health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXVII
**Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.***
**Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq.***

232.    The allegations of the preceding paragraphs are realleged as if fully set forth

below.

233.    This is a claim for treble damages and civil penalties under the Tennessee

Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq*., and the Tennessee False Claims

Act, Tenn. Code Ann. § 4-18-101 *et seq*.

234.    By virtue of the off-label and false marketing and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

Tennessee Medicaid Program (i.e. TennCare) and state health plans for public employees false or

fraudulent claims for the improper payment or approval of prescriptions for Vimpat and

knowingly used false or fraudulent records to accomplish this purpose.

235.    The Tennessee Medicaid Program and other state health plans, unaware of the

falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise

would not have been allowed.

236.    By reason of these payments, the Tennessee Medicaid Program and other state

health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXVIII
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

237.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

238.    This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act. Tex. Hum. Res. Code Ann. § 36.001 *et seq*.

239.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly made a claim to the Texas Medicaid Program for a product that has been adulterated, debased, or mislabeled, or that is otherwise inappropriate, and caused to be presented to the Texas Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

240.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

241.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT XXIX
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. § 8.01-216.1 *et seq.*

242.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

243.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act. Va. Code Ann. §8.01-216.1 *et seq*.

52

244. By virtue of the off-label and false marketing, and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Virginia Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

245. The Virginia Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

246. By reason of these payments, the Virginia Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

## COUNT XXX
### Washington Medicaid Fraud False Claims Act
### Wash. Rev. Code § 74.66.005 *et seq*.

247. The allegations of the preceding paragraphs are realleged as if fully set forth below.

248. This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq*.

249. By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Washington Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

250. The Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

251. By reason of these payments, the Washington Medicaid Program has been damaged and continues to be damaged in a substantial amount.

**COUNT XXXI**
**Wisconsin False Claims Act**
**Wis. Stat. § 20.931 *et seq.***

252. The allegations of the preceding paragraphs are realleged as if fully set forth below.

253. This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act. Wis. Stat. § 20.931 *et seq*.

254. By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Wisconsin Medicaid Program and state health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

255. The Wisconsin Medicaid Program and other state health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

256. By reason of these payments, the Wisconsin Medicaid Program and other state health plans have been damaged, and continue to be damaged in a substantial amount.

54

## COUNT XXXII
### District of Columbia False Claims Act
### D.C. Code § 2-308.13 *et seq.*

257.     The allegations of the preceding paragraphs are realleged as if fully set forth

below.

258.     This is a claim for treble damages and civil penalties under the District of

Columbia False Claims Act. D.C. Code § 2-308.13 *et seq*.

259.     By virtue of the off-label and false marketing and submissions of

non-reimbursable claims described above, Defendants knowingly caused to be presented to the

District of Columbia Medicaid Program and health plans for public employees false or fraudulent

claims for the improper payment or approval of prescriptions for Vimpat and knowingly used

false or fraudulent records to accomplish this purpose.

260.     The District of Columbia Medicaid Program and other District health plans,

unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for

claims that otherwise would not have been allowed.

261.     By reason of these payments, the District of Columbia Medicaid Program and

other District health plans have been damaged, and continue to be damaged in a substantial

amount.

## COUNT XXXIII
### The City of Chicago False Claims Act
### Chicago Municipal Code, § 1-22-010 *et seq.*

262.     The allegations of the preceding paragraphs are realleged as if fully set forth

below.

263.    This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act.  Chicago Municipal Code § 1-22-010 *et seq*.

264.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Chicago Department of Public Health and city health plans for public employees false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

265.    The City of Chicago Department of Public Health and other city health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

266.    By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

### COUNT XXXIV
### New York City False Claims Act
### New York City Adm. Code, § 7-801 *et seq*.

267.    The allegations of the preceding paragraphs are realleged as if fully set forth below.

268.    This is a claim for treble damages and civil penalties under the New York False Claims Act, New York Adm. Code, § 7-801 *et seq*.

269.    By virtue of the off-label and false marketing and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New York City Health and Hospitals Corporation and city health plans for public employees

false or fraudulent claims for the improper payment or approval of prescriptions for Vimpat and knowingly used false or fraudulent records to accomplish this purpose.

270.    The New York City Health and Hospitals Corporation and other city health plans, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

271.    By reason of these payments, the New York City Health and Hospitals Corporation and other city health plans have been damaged, and continue to be damaged in a significant amount.

**PRAYER FOR RELIEF**

WHEREFORE, Relator Ardoin requests that judgment be entered against the Defendants, ordering that:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

2. Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of the Defendants' actions;

3. Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state false claims acts;

4. Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

5. Relator be provided with injunctive or equitable relief, as may be appropriate, to prevent further harm to himself and to prevent the harm to others and the public caused by Defendants' retaliation against whistleblowers;

6. Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

7. Defendants disgorge all sums by which they have been enriched unjustly by its wrongful conduct;

8. Relator be awarded all other damages to which he is entitled, including compensatory and punitive damages; and

9. The United States, the Individual States, and Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

Mark Hanna (DC Bar 471960)
Lorrie E. Bradley (DC Bar 996379)
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Ann Lugbill (DC Bar 462850)
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1449
*alugbill@murphypllc.com*

P. Jody Lavergne
Russell J. Stutes, Jr.
Rob McCorquodale
Stutes & Lavergne
600 Broad Street
Lake Charles, LA 70601
Phone: (337) 377-0629
Fax: (337) 433-0601
*jody@stuteslaw.com*
*rusty@stuteslaw.com*
*rob@stuteslaw.com*

**Attorneys for Relator Ardoin**

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury.

Mark Hanna

59

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April 2013, a copy of the foregoing Complaint shall be served upon the following individuals as indicated below.

_____
Mark Hanna

**Relator's Counsel - via regular U.S. Mail (on date of filing of Complaint)**

Mark Hanna
Lorrie E. Bradley
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax: (202) 223-8651
*mhanna@murphypllc.com*
*lbradley@murphypllc.com*

Ann Lugbill
Murphy Anderson PLLC
2406 Auburn Avenue
Cincinnati, OH 45219
Phone: (513) 784-1280
Fax: (877) 784-1449
*alugbill@murphypllc.com*

P. Jody Lavergne
Russell J. Stutes, Jr.
Rob McCorquodale
Stutes & Lavergne
600 Broad Street
Lake Charles, LA 70601
Phone: (337) 377-0629
Fax: (337) 433-0601
*jody@stuteslaw.com*
*rusty@stuteslaw.com*
*rob@stuteslaw.com*

**U.S. Department of Justice - via Certified U.S. Mail two business days following filing of Complaint:**

Honorable Eric H. Holder Jr.
United States Attorney General
Attn: Dan Anderson
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC  20044

Ronald C. Machen, Jr.
U.S. Attorney for the
District of Columbia
Judiciary Center, 555 4th Street, NW
Washington, DC 20004

**Counsel for the States - via Certified U.S. Mail, 10 days after filing of Complaint**, together with a copy of the Relator's Disclosure.

Kamala D. Harris
Attorney General of California
1300 "I" Street
Sacramento, CA 95814-2919

John Suthers
Attorney General of Colorado
Colorado Department of Law
1300 Broadway, 9th Floor
Denver, CO 80203

George C. Jepsen
Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106–1774

Honorable Joseph "Beau" Biden, III
Attorney General of Delaware
Carvel State Office Building
820 North French Street
Wilmington, DE 19801

Jeff Atwater, Chief Financial Officer
Division of Legal Services
Florida Department of Financial Services
200 East Gaines Street
Tallahasee, FL 32399

Pam Bondi
Attorney General of Florida
PL-01 The Capitol
Tallahassee, FL  32399-1050

Sam Olens
Attorney General of Georgia
40 Capitol Square, SW
Atlanta, GA 30334-1300

David M. Louie
Attorney General of Hawaii
425 Queen St.
Honolulu, HI 96813

Lisa Madigan
Attorney General of Illinois
James R. Thompson Center
100 W. Randolph Street
Chicago, IL 60601

David O. Thomas
Indiana Inspector General
315 West Ohio Street, Room 104
Indianapolis, IN 46202

Greg Zoeller
Attorney General of Indiana
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN 46204

Tom Miller
Attorney General of Iowa
1305 E. Walnut Street
Des Moines, IA 50319

James D. Caldwell
Attorney General of Louisiana
P.O. Box 94095
Baton Rouge, LA 70804-4095

Douglas F. Gansler
Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202-2202

Martha Coakley
Attorney General of Massachusetts
McCormack Building
One Ashburton Place
Boston, MA 02108

Bill Schuette
Attorney General of Michigan
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
Lansing, MI 48909

Lori Swanson
Attorney General of Minnesota
State Capitol, Ste. 102,
St. Paul, MN 55155

Tim Fox
Attorney General of Montana
Justice Building
215 North Sanders
Helena, MT 59620–1401

Catherine Cortez Masto
Attorney General of Nevada
198 North Carson Street
Carson City, NV  89701-4717

Jeffrey S. Chiesa
Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625

Gary King
Attorney General of New Mexico
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501

Eric T. Schneiderman
Attorney General of New York
The Capitol , 2nd Floor
Albany, NY 12224-0341

Roy Cooper
Attorney General of North Carolina
Department of Justice
P.O. Box 629
Raleigh, NC  27609-0629

Scott Pruitt
Attorney General of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105

Peter Kilmartin
Attorney General of Rhode Island
150 S. Main Street
Providence, RI 02903
Phone: 401-274-4400

Robert E. Cooper, Jr.
Attorney General of Tennessee
425 5th Avenue North
Nashville, TN  37243

Greg Abbot
Attorney General of Texas
Capitol Station, P.O. Box 12548
Austin, TX 78711-2548

Kenneth T. Cuccinelli, II
Attorney General of Virginia
900 East Main Street
Richmond, VA 23219

Bob Ferguson
Attorney General of Washington
1125 Washington Street SE
P.O. Box 40100
Olympia, WA 98504

J.B. Van Hollen
Attorney General of Wisconsin
State Capitol, Suite 114 East
P.O. Box 7857
Madison, WI 53707-7857
Phone: 608-266-1221

Irvin B. Nathan
Attorney General of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Avenue NW, Suite 409
Washington, DC 20009

**Counsel for Cities - via Certified  U.S. Mail, 10 days after filing of Complaint**

Susana A. Mendoza
City Clerk of Chicago
121 North LaSalle Street, Room 107
Chicago, IL 60602

Michael A. Cardozo
New York City Corporation Counsel
100 Church Street
New York, NY 10007